CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

JUN 1 5 2009

BY: JOHN F. CORCORAN, CLERK
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| EDWARD KUBIK, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:08cv458 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | By: Michael F. Urbanski |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Edward Kubik, Jr. ("Kubik") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "Act"). On appeal, Kubik principally argues that the Commissioner erred by not properly evaluating his claimed mental impairments and by deciding that plaintiff did not meet or medically equal the coronary artery disease listing. After reviewing the entirety of the administrative record and Kubik's medical history, the undersigned finds that substantial evidence supports the Commissioner's conclusion that Kubik is not disabled from all substantial gainful activity. While it is certainly true that Kubik suffers from a variety of ailments, the record does not establish that he is disabled from all work as he claims. In particular, there are no treating, examining, or evaluating medical opinions in the record indicating that Kubik's symptoms rise to the level of a permanent disability. Although Kubik suffered from depression, the evidence plainly shows that this depression responded to treatment in a few months. In addition, while Kubik may meet the first prong of Listing of Impairments ("Listing") 4.04C, 20 C.F.R. pt. 404, subpt. B, app. 1, for coronary artery disease, he fails to demonstrate that he meets the second

prong requiring a marked limitation in physical activity. Accordingly, he cannot meet his burden of showing that he is permanently disabled from performing any substantial gainful activity. As such, the Commissioner's decision is supported by substantial evidence and must be affirmed.

## I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than

2

a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

Case 7:08-cv-00458-JCT-mfu   Document 18   Filed 06/15/09   Page 3 of 12   Pageid#: 64

## II

Kubik was born in 1963 (Administrative Record, hereinafter "R." 24), and at the time of the Commissioner's decision was considered a "younger individual" under the Act. 20 C.F.R. §§ 404.1563(b), 416.963(b). Kubik graduated from high school and finished two years of college, taking courses in nursing and criminal justice. (R. 24.) While Kubik did not obtain a certificate or degree in either one of those disciplines, he does maintain a license to work as a private security guard. (R. 50-51.) Kubik worked as a security guard for many different companies. (R. 25, 29, 31, 147.) In addition, he delivered pizzas in 1997 and 1998 and owned a bar from 1998 to 2003. (R. 147.) Kubik alleges a disability onset date of September 7, 2005, claiming that the following conditions limited his ability to work: cancer causing him to lose his right eye, diabetes, coronary artery disease, and knee problems. (R. 119, 146.) Despite these conditions, Kubik continues to work part-time as a security guard at a warehouse, working one day a week for twelve hours.

Kubik's application for benefits was rejected by the Commissioner initially and again upon reconsideration. (R. 92-101, 104-109.) An administrative hearing was convened before an Administrative Law Judge ("ALJ") on January 25, 2007. (R. 19-78.) In determining whether Kubik was disabled under the Act, the ALJ found that he had medically determinable impairments, including coronary artery disease, diabetes mellitus, degenerative joint disease, and loss of his right eye due to cancer, that qualify as severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. 12.) The administrative record contains no medical opinions from a consulting, treating or other physician indicating that Kubik was permanently disabled by his myriad impairments. In separate evaluations a year apart, two state agency physicians reviewed Kubik's medical records and found that he retained the RFC to perform some work. (R. 254-60, 305-312.) These opinions were relied upon by the ALJ who determined that Kubik

4

retained the RFC to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for six hours out of eight, and sit for six hours out of eight. (R. 13.) Based on this RFC and the testimony of a vocational expert at the administrative hearing, the ALJ found that there were significant numbers of light and sedentary jobs in the national economy that a hypothetical individual with Kubik's characteristics could perform. (R. 17.) As such, the ALJ concluded that Kubik was not under a disability as defined in the Act. The Appeals Council denied Kubik's request for review, and this appeal followed. (R. 1-3.)

## III

Kubik's application for disability benefits focuses on both his physical impairments and mental health issues. Review of the record makes it clear that substantial evidence supports the Commissioner's decision that Kubik's physical and mental impairments do not render him disabled from all work.

Kubik was admitted to Roanoke Memorial Hospital on March 11, 2005 with complaints of chest and arm pain. (R. 237-38.) On physical examination, Dr. Alan E. McLuckie diagnosed him with acute inferior wall myocardial infarction. (R. 238.) Dr. McLuckie performed surgery, inserting stents into Kubik's right coronary artery to relieve the occlusion, and found a chronic total occlusion of a left coronary artery. (R. 238-42.) Rather than inserting a stent in the left artery, Dr. McLuckie decided to medically manage the occlusion. (R. 242-43.) On March 13, 2005, Dr. Carl H. Bivens examined Kubik and diagnosed him with two-vessel obstructive coronary artery disease involving the right coronary artery and a chronic total occlusion of the left anterior descending coronary artery, hyperlipidemia, and non-insulin requiring diabetes. (R. 240.) Kubik's doctors' recommended that he remain in the hospital and receive further cardiac treatment, but he chose to leave. (R. 235-36.) Although Kubik's discharge report noted

5

that he was required to have follow-up care, he returned to work two months later without any follow-up treatment. (R. 26-7, 140, 337.)

On September 1, 2005, Dr. James S. Tiedeman examined Kubik for decreasing vision in the right eye. (R. 261.) Ultimately, it was determined that Kubik suffered from an isolated tumor of the right eye, and that eye was removed on January 17, 2006. (R. 280-81, 293-97.)

Kubik also complained of problems with his knees stemming from degenerative joint disease. Kubik was first seen on referral for knee pain by Dr. John R. Edwards on July 11, 2006. Kubik told Dr. Edwards that he had suffered from knee pain for some 25 years. Kubik reported increasing knee pain with activity over the past year and reported 3-4 episodes of instability over the past month. On physical examination, Dr. Edwards noted that Kubik had full range of motion in both knees and only mild tenderness and mild patellofemoral tracking on the left. (R. 360.) Following review of x-rays, Dr. Edwards stated that Kubik's "knees appear to be in good shape radiographically." (R. 360.) Dr. Edwards diagnosed patellofemoral syndrome[2] and ordered physical therapy for quadriceps strengthening. Kubik was seen again on August 15, 2006 for knee pain. Dr. Edwards again found "quite good range of motion of both knees" despite complaints of patellofemoral discomfort. (R. 374.) He again reviewed Kubik's exercise program, determined to fit him with knee sleeves with patellor cut-outs and planned to investigate a rheumatologic evaluation. (R. 374.) Kubik was seen by a rheumotologist, Dr. Robert R. Johnson, on September 20, 2006, who noted that he saw "no evidence to suggest systemic inflammatory polyarthritis." (R. 419).

There are no opinions from any of Kubik's treating physicians that he is disabled by his impairments. Two state agency doctors opined that Kubik has the ability to lift and carry twenty

---

[2] Patellofemoral syndrome (chondromalacia patella) is abnormal softening of the cartilage under the kneecap, resulting from poor alignment of the kneecap as it slides over the lower end of the femur. http://www.medicinenet.com/patellofemoral_syndrome/article.htm.

Case 7:08-cv-00458-JCT-mfu    Document 18    Filed 06/15/09    Page 6 of 12    Pageid#: 67

pounds occasionally and ten pounds frequently, stand and walk for six hours out of eight, and sit

for six hours out of eight. Given the lack of any conflicting evidence, the ALJ's conclusion in

this regard is supported by substantial evidence. (R. 13.)

## IV

Kubik's appeal focuses primarily on the Commissioner's consideration of his mental

health issues and whether his heart disease rose to the level of a listed impairment. He argues

that the ALJ erred in his evaluation of Kubik's mental impairments and, at the very least, should

have ordered a consultative exam to evaluate the effects of Kubik's mental impairments on his

ability to work. Kubik also claims that the ALJ erred by failing to properly consider whether

Kubik would meet or medically equal the coronary artery disease listing.

### A.

As regards Kubik's claimed mental impairments, the ALJ determined that Kubik's

depression and anxiety were not severe because Kubik did not receive mental health treatment

until September 2006, and by January 2007, his condition had improved with medication and

counseling. (R. 13, 468, 470.)

Kubik was first examined at the Mental Health Collaborative Clinic by Dr. Kanjit Vohra

on September 11, 2006 and was diagnosed with major depression, chronic, recurrent, acute

exacerbation because of multiple medical problems, and alcohol dependence in sustained

complete remission. Dr. Vohra initially pegged Kubik's global assessment of functioning

("GAF") at 40-45.[3] (R. 474-75.) Prior to this time, Kubik had never seen a psychologist or

psychiatrist. (R. 474-75.) In addition, Kubik had no history of any phobias or anxiety disorders

---

[3] A GAF in the low 40s indicates serious symptoms or an impairment in a social, occupational or school functioning. However, Kubik's GAF level was estimated only once, in September 2006, before his treatment began. It does not, therefore, reflect his level of functioning following counseling and medication.

7

and had never taken antidepressants. (R. 474-75.) Dr. Vohra prescribed Fluoxetine for Kubik's depression, which was later changed to Clonzaepam three times daily and Paxil. (R. 471, 475.)

Three months later, Kubik visited Dr. Sachin Vasudeva, a psychiatrist. (R. 469.) During this visit, Kubik stated that he had been off of his medications for a couple of weeks because somebody stole them and that he only took one third of the prescribed amount of Clonazepam. (R. 469.) As a result, Dr. Vasudeva advised Kubik to resume his medication. (R. 469.)

By January of 2007, Kubik had improved, claiming that he felt "better than before," had less of a fatigue problem, more optimism, went out to eat, had friends visit his apartment, had not missed work, and even picked up another shift. (R. 470.) Based on this evidence of improvement, the ALJ determined that Kubik's mental condition was not severe since an impairment must prevent, or be expected to prevent, substantial gainful activity for twelve months in order to be disabling under the Act. 42 U.S.C. § 423(d)(1)(A). The ALJ found that Kubik was unable to meet the twelve month requirement as he was diagnosed with depression in September 2006 and had improved with medications by January 2007. (R. 13.)

Kubik's assertions that the ALJ improperly weighed his credibility regarding his mental impairment and his ability to engage in substantial work activity are without merit. It is well settled that credibility determinations are in the province of the ALJ, and that courts normally ought not to interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989). Here, Kubik's testimony as to his limitations was considered in the context of all of the evidence before the ALJ, and the ALJ determined that Kubik's testimony was not entirely credible. (R. 15.) The ALJ's credibility determination is well supported. Indeed, although Kubik told his psychiatrist that he had been depressed since his eye surgery in March of 2005; in May of 2006, he denied depression, anxiety, memory loss, mental disturbance, suicidal ideation, hallucinations, or paranoia. (R. 315.) In addition, the ALJ noted that Kubik was going to

8

the Moose Lodge once a week through June of 2006, shopped twice a week, and had plans to fly to Mississippi with his sister to go gambling in a casino. (R. 15.) Kubik admitted after his eye surgery that he followed written and spoken instructions "very well," he got along with authority figures "very well," he never had problems being fired or laid off, he handled stress well, he handled changes in routine well, and he had no unusual behavior or fears. (R. 211-12.)

Nor was the ALJ required to obtain a consultative mental examination. The Social Security regulations authorize the Commissioner to obtain a consultative examination when the existing medical records are conflicting or ambiguous or do not contain sufficient information to enable the Commissioner to make a decision. 20 C.F.R. §§ 404.1519a, 416.919c. Here, the record contains all of Kubik's mental health treatment records, and it is plain from them that his depression responded well to treatment. Under these circumstances, there was no requirement to obtain a consultative examination. See Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965) ("claimant who has a disabling impairment which can reasonably be classified as remediable is not entitled to receive disability benefits.")

The ALJ found that Kubik's mental impairments were not severe due to Kubik's lack of credibility and because his condition improved with treatment. Substantial evidence supports the Commissioner's conclusion that Kubik's mental health issues did not prevent him from engaging in any substantial gainful activity over a twelve month period.

## B.

Kubik also argues that the ALJ erred by failing to properly consider whether Kubik would meet or medically equal Listing 4.04C. The ALJ determined that Kubik did not meet Listing 404.C because he did not have very serious limitations in the ability to independently initiate, sustain, and complete activities of daily living. (R. 35.)

The requirements to meet Listing 4.04C are as follows:

9

C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation), and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that pe rformance of exercise testing would present a significant risk to the individual, with both 1 and 2:

1. Angiographic evidence revealing:

\* \* \*

b. 70 percent or more narrowing of another nonbypassed coronary artery; . . . and

2. Resulting in marked limitations of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or angina discomfort on ordinary physical activity, even though the individual is comfortable at rest.

In order to meet Listing 4.04C, Kubik has to meet both prongs of the listing. (R. 35.)

The record reveals that Kubik declined to follow his doctors' orders to stay in the hospital to treat the occlusion in his left descending artery. (R. 14, 32, 34-39, 235.) The discharge note reflects that Kubik "elected not to have further inpatient medical care for his myocardial infarction and was with normal mental status and able to make decisions for himself." (R. 235.) In addition, Kubik did not follow-up with his cardiologist and take prescribed medications for several months. (R. 14, 32, 34, 235, 337.) Kubik then returned to work two months later. (R. 26-27, 140, 337.) On November 11, 2005, Dr. Belal S. Khonokhar noted that Kubik had been "[l]ost to follow up for 4 months now" following his heart attack. (R. 337.)

Following his March 2005 heart procedure, Kubik continued to attend the Moose Lodge for another year, continued to work as a security guard and planned to travel with his sister to visit a casino in Mississippi. (R. 25-26, 210, 468.) In addition, Kubik stated in September 2006 that he exercised three times per week to strengthen his legs and knee muscles. (R. 424.)

The ALJ found that Kubik did not meet all of the requirements of Listing 4.04C. (R. 35.) In response to plaintiff's counsel's statement that Kubik has a 100% blocked artery, the ALJ

10

responded, "you only cited number one. It takes number one and two of the listing." (R. 35.) The ALJ's conclusion that Kubik's continued part-time work and other activities of daily living did not meet the requirements of the second prong of Listing 4.04C is plainly supported by substantial evidence. (R. 35.) Simply put, the ALJ properly recognized that Kubik offered insufficient evidence to meet the second prong of Listing 4.04C. As a result, Kubik cannot meet his burden of showing that he is permanently disabled from doing any substantial gainful activity. Under these circumstances, there is substantial evidence to support the ALJ's determination that Kubik's cardiac impairment did not result in the serious limitations in his activities of daily living required to meet Listing 4.04C.

V

At the end of the day, it is not the province of the reviewing court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence, and, in this case, substantial evidence clearly supports the ALJ's decision. In recommending that the final decision of the Commissioner be affirmed, the undersigned does not suggest that Kubik is totally free of any medical problems. The objective medical record simply fails to document the existence of any physical and/or mental conditions which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It is significant in this regard that there are no medical opinions in the record that support a finding of total disability. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Kubik's claim for benefits and in determining that his physical and mental impairments would not prevent him from performing any work. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence.

11

The Clerk is directed immediately to transmit the record in this case to the Hon. James C. Turk, Senior United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to plaintiff and counsel of record for defendant.

Enter this 15th day of June, 2009.

Michael F. Urbanski
United States Magistrate Judge